## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MENG VANG,                                    Civil No. 11-90 (SRN/AJB)

                        Petitioner,

v.                                    **REPORT AND RECOMMENDATION
                                       ON HABEAS CORPUS PETITION**

JOAN FABIAN,
*Commissioner*,

                        Respondent.

---

Meng Vang, #225200, MCF – Stillwater, 970 Pickett Street North, Bayport, MN 55003-1489, pro se petitioner.

Kimberly R. Parker and Matthew Frank, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, Suite 1800, 445 Minnesota Street Suite 1800, St Paul, MN 55101; Marcy S. Crain, **ANOKA COUNTY ATTORNEY'S OFFICE**, 2100 Third Avenue North, Anoka, MN 55403-2265, for respondent.

ARTHUR J. BOYLAN, United States Magistrate Judge

## I.    INTRODUCTION

This matter is before the Court for a Report and Recommendation to the District Court, pursuant to 28 U.S.C. § 636(b)(1), D. Minn. L.R. 72.1,  regarding Meng Vang's Petition for a Writ of Habeas Corpus.  (Docket No. 1.)  A jury convicted Vang of twelve counts, including two counts of aiding and abetting murder for the benefit of a gang in the shooting deaths of Tashi Jagottsang and Bunsean Lieng; and four counts of attempted first degree murder in the shooting injuries of Tenzin Tsondu, Tenzin Phelgye Woser,

Tenzin Tenpa, and Tenzin Choegyal.  *See State v. Vang*, 774 N.W.2d 566, 571 (Minn. 2009).   Vang asserts four issues that he argues qualify him for habeas relief: unconstitutional search and seizure; illegal arrest; ineffective assistance of counsel; and denial of his right to a speedy trial.  The state argues that none of these claims were raised in his direct appeal and therefore he has failed to exhaust state remedies, barring him from habeas relief.  Further, the state argues that since Vang's claims are procedurally barred in state court, his petition should be dismissed with prejudice.  Because Vang's claims could have been raised on his direct appeal, and therefore are procedurally barred, and because his claims fail on their merits, the Court recommends dismissal with prejudice.

## II.   BACKGROUND[1]

About 10:00 p.m. on February 3, 2005, police responded to a report that a fight had erupted at Jimmy's Pro Billiards (Jimmy's) in Columbia Heights and that shots had been fired.  Within seconds, Officer Greg Sinn arrived on the scene and observed a body, later identified as Bunsean Lieng, lying on the floor of a parking ramp about 60 feet from the pool hall.  Lieng had suffered a fatal gunshot wound to the head.  A few seconds after arriving at the scene, Sinn saw a black Honda with its lights off exit the parking ramp going the wrong way.  A police car driven by Officer Matt Aish arrived a few seconds later.  Officer Aish saw the black Honda quickly accelerate through a stop sign onto a city street.

---

[1] The facts of the incident and trial are taken almost verbatim from the Minnesota Supreme Court's decision on direct appeal, 774 N.W.2d at 572-75, as no variation from this factual synopsis was provided by Vang or the state in the briefing on the instant motion.

Officer Aish stopped the black Honda.  Jason Moua was driving the black Honda, and Helene Yang and Meng Vang were passengers.  Police found a blue bandana and a box of .38 caliber Winchester ammunition in the black Honda.  About half a block away from Jimmy's, police found a 9mm Taurus handgun lying in a snowbank.

At the same time, police also stopped a dark blue Honda Civic about one block from the location of the stopped black Honda.  Sai Vang was the driver, and Charles Yang and Grogan Yang were the passengers.  In the dark blue Honda Civic, police found a 9mm Jennings handgun, a .38 revolver, a .357 Magnum revolver, and spent casings under the seats.

In a small park nearby, police found the body of Tashi Jagottsang.  Jagottsang had sustained multiple wounds that were consistent with bullets fired from a .357, .38, or 9mm handgun; he died from the injuries.  Tenzin Tsondu, Tenzin Phelgye Woser, Tenzin Tenpa, and Tenzin Choegyal were also injured from gunshot wounds arising out of the same incident.  These victims were all Tibetan men, with the exception of Bunsean Lieng, who was Cambodian.

Subsequent ballistics testing confirmed that cartridge casings recovered from the parking ramp behind the pool hall had been fired from the 9mm Taurus handgun found in the snowbank, and the spent casings found under the seat of the dark blue Honda Civic had been fired from the 9mm Jennings pistol.

Nine days later police stopped a maroon Acura driven by Richard Vang and owned by Yatau Her.  This car had been seen at Jimmy's on the night of the incident.  Police discovered a silver and black Smith and Wesson handgun in the car.  Testing

showed that this gun had fired nine spent  cartridge casings found in the alley behind Jimmy's, as well as a bullet recovered from Tenzin Choegyal's clothing.

Police executed search warrants at the homes of Sai Vang, Jason Moua, Charles and Grogan Yang, and at a residence associated with Meng Vang.  Subsequently, Meng Vang was indicted.  Before trial, Meng Vang brought a motion to prohibit Officer Richard Straka from presenting expert gang testimony on the ground that the testimony would violate his right of confrontation under state and federal law.  The district court deferred ruling on the motion until after the State had finished its lay witness testimony.

At trial, the State presented testimony regarding certain events that led up to the incident at Jimmy's.  Specifically, the State showed that a few weeks before the incident in question Jason Moua, who is a MOD gang member, and Lue Vang were involved in a fight with a group of about ten Hmong men outside a bowling alley.  Both Moua and Vang were injured, and Vang was hospitalized for four days.  To celebrate his recovery, Vang planned a barbeque with his cousins.

A few days later, Lue Vang and Sai Vang, who are cousins, went to a St. Paul motel to visit Sai Vang's cousin from California. Meng Vang, Jason Moua, Charles and Grogan Yang, Xee Lor, and others were also present that evening.  Lue Vang told the group that Moua and he had been involved in a fight with a gang of Hmong men at a local bowling alley.  Moua also gave Sai Vang a loaded 9mm handgun, which Vang put under the driver's seat of his dark blue Honda Civic.

The next evening, Lue Vang had the barbeque.  Meng Vang, Jason Moua, Sai Vang, Charles and Grogan Yang, Helene Yang, and Xee Lor, among others, were at the

barbeque.   At one point, several members of the group decided to go to Jimmy's Billiards.   They left in three cars.   Moua drove a black Honda with Helene Yang and Meng Vang as passengers, Sai Vang drove a dark blue Honda Civic with Charles and Grogan Yang as passengers, and Yatau Her drove a maroon Acura with Xee Lor and Fong Vang as passengers.

At the same time, a group of Tibetans was playing pool at Jimmy's.   At one point, several of the Tibetans stepped out of the pool hall and into the adjoining alley.   As two of the Tibetans walked to their car, a car carrying several Asian men pulled up.   The men in the car began to scream at the Tibetans.   A third Tibetan, Jampa Ritzekura, approached the car to intercede.   One of the passengers made hand signs and screamed, "What do you claim?"   The Tibetans answered "we don't claim nothing" and walked away.

A few Tibetans left the parking ramp in a car, but then returned to meet Bunsean Lieng and other Tibetans.   After discussing what had happened, several of the Tibetans decided to return to the pool hall to talk to the Asian men.   Once inside the pool hall, Jampa Ritzekura identified Grogan Yang as one of the people who had confronted him outside the pool hall.   As the Tibetans approached Grogan Yang and his companions, including Meng Vang, a fight erupted between the two groups.   Witnesses stated that pool balls and cue sticks were flying.   Subsequently, the Tibetans ran out of the pool hall into the alley and fled in different directions.   Grogan Yang, Meng Vang, and other MOD members chased after the Tibetans.   Multiple gunshots were fired, both in the alley behind Jimmy's and in the parking lot.   One of the Tibetans, Tenzin Yulme, testified that Bunsean Lieng was shot in the parking ramp by a man matching Meng Vang's

description, that the shooter got into a car, and that the car left the scene with its tires screeching.

Helene Yang, who is the wife of Jason Moua, testified pursuant to a plea agreement. She stated that she saw Meng Vang shoot a Tibetan man in the parking ramp and saw the man fall to the ground. Subsequently, she and Meng Vang got into Moua's car, and Moua drove the car out of the parking ramp going the wrong way at high speed. She testified that Meng Vang, Jason Moua, Charles Yang, Grogan Yang, Xee Lor, and Yatau Her are members of MOD. She also stated that MOD means "Menace of Destruction" and baby blue is the color of MOD. But she refused to testify as to the meaning or connection of the number "301" to MOD or to the specific hand signs associated with MOD.

Sai Vang, who also testified pursuant to a plea agreement, stated that he heard 7–10 shots coming from the alley as he ran to his car. He testified that he saw Grogan Yang shooting at the fleeing Tibetans. Sai Vang also testified that MOD means "Menace of Destruction." He testified that Jason Moua, Yatau Her, Charles Yang, and Grogan Yang are MOD members. He refused to testify about MOD's identifying colors or hand signs.

Other lay witnesses testified about MOD's identifying colors and hand signs, that members of MOD had been convicted of crimes committed for the benefit of a gang, and that the acronym MOD stands for "Menace of Destruction." But those witnesses were also evasive in some respects about MOD. For example, one witness evaded questions asking him to identify fellow MOD members and explain paraphernalia, including hats and rap CDs associated with MOD.

When the State called Officer Richard Straka to testify as a gang expert, Meng Vang objected on the grounds that his testimony would be hearsay and violated his right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004).  The court overruled the objections and allowed the testimony.

Officer Straka, who is employed by the gang unit of the St. Paul Police Department, testified that he has been a police officer for 22 years and has specialized training regarding criminal street gangs dating back to about 1997.  Straka explained that the Minnesota Gang Strike Force collects information on gangs and gang members, and described how the strike force records that information on field-interview cards. According to Straka, "in order to be a gang you have to have power," and that if you are not powerful or strong, other gangs will be "constantly picking on you, fighting with you, shooting at you."

Straka described Asian gangs in Minnesota, particularly MOD.  He testified that MOD stands for Menace of Destruction, Masters of Destruction, or Men of Destruction, depending on the state in which the gang is located. The number "301" relates to the hand sign for MOD—"3" represents "M," "0" represents "O," and "1" represents "D." Minnesota's MOD colors are primarily blue.  The MOD gang has several websites that it uses to communicate and to post photographs of gang members "throwing" hand signs and showing guns.  After the pool hall shootings, the MOD website posted booking photos of six people arrested in the pool hall shooting, including Meng Vang, as well as television news footage about the incident.

According to Straka, he met with Meng Vang about six days before the pool hall incident. During that meeting, Meng Vang told Straka that "a lot of gangs hate us, the MOD." He informed Straka that when ten MOD members get together, there is "going to be trouble." Straka met with Charles Yang, who told him that he and Meng Vang were members of the MOD gang. Straka testified that Xee Lor, Fong Vang, and Richard Vang are MOD gang members. Straka also identified numerous admitted MOD members and their convictions for crimes committed "for the benefit of a gang."

Finally, the State called two jailhouse informants as witnesses. Donald Gardner, who was incarcerated with Meng Vang, testified that he overheard Meng Vang tell another inmate that he and others went to the pool hall, got into a confrontation with a rival gang and a fight broke out, and he started shooting. He also overheard Meng Vang state they got rid of the guns "behind a building or a church," and that nobody messes with him and MOD. Gardner also testified that he saw Meng Vang "throw gang signs" as he walked past Jason Moua in the prison.

Sincere Page–El, who was also incarcerated with Meng Vang, testified that he overheard Meng Vang tell another inmate that after the fight at the pool hall, he and Fong Vang grabbed handguns and started shooting at others outside the pool hall. According to Page–El, Meng Vang stated that he and "Squid" (Fong Vang) left the area of the shootings in two cars and threw their guns (except for the chrome gun) by the church.

In the appeal of his conviction to the Minnesota Supreme Court, Vang raised five issues: the trial court abused its discretion by allowing the gang expert testimony and by excluding evidence related to incentives the jailhouse informants may have received in

exchange for their testimony; the jury instruction on accomplice liability was a material misstatement of the law; the evidence was not sufficient to establish the necessary element of premeditation; and the trial court abused its discretion in imposing consecutive sentences. *Vang*, 774 N.W.2d at 572. The Supreme Court denied relief on all grounds and affirmed Vang's conviction and sentence. *Id.* at 584.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act ("AEDPA") prescribes the standards that govern this Court's substantive review of Vang's habeas corpus claims. Pub. L. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of U.S.C.) The relevant portion of the AEDPA provides that:

> (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>
> (A) the applicant has exhausted the remedies available in the courts of the State . . . .
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(b).

The Supreme Court has explained that "a state prisoner seeking federal habeas relief must first exhaust the remedies available in the courts of the State, thereby affording those courts the first opportunity to address and correct alleged violations of the prisoner's federal rights . . . ." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (quotation marks, citations, and alterations omitted). Here, Vang would be unable to utilize state

postconviction procedures since he needed to seek such relief no more than two years after the Minnesota Supreme Court decided his appeal. *See* Minn. Stat. § 590.01 subdiv. 4. Furthermore, the issues Vang raises in his habeas petition are ones he could have raised on his appeal, barring him further from state remedies. *See id.* subdiv. 1 ("A petition for postconviction relief after a direct appeal has been completed may not be based on grounds that could have been raised on direct appeal of the conviction or sentence.").

Thus, Vang has defaulted his state claims rather than failing to exhaust his state remedies. *See Jackson v. Symmes*, No. 09-2946, 2011 WL 1300930, at *10 (D. Minn. Jan. 18, 2011) ("[W]hen a prisoner has not exhausted his state court remedies for some particular claim, and state procedural rules preclude any further attempts to satisfy the exhaustion requirement as to that claim, then the claim is not truly 'unexhausted,' but rather, it has been 'procedurally defaulted.'"). However, a federal court is barred from hearing defaulted claims[2] on habeas unless the prisoner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Here, Vang's argument as to cause for his failure to raise his claims is that he is just now learning the law from inmates and therefore did not know of certain legal issues

---

[2] A further requirement of the bar on defaulted claims is that the default occurs pursuant to "an independent and adequate state procedural rule . . . ." *Coleman*, 501 U.S. at 750. Vang makes no argument, nor does the Court find any independent justification for questioning the adequacy of the Minnesota statute that defaults his claims. *See* Minn. Stat. § 590.01 subdivs. 1, 4.

in his prior appeal.   (Resp. at 8, Docket No. 25.)   However, ignorance of the law does not

constitute cause in the context of default claims.   *Coleman*, 501 U.S. at 752; *Maynard v.*

*Lockhart*, 981 F.2d 981, 984 n.2 (8th Cir. 1992).   Further, the miscarriage of justice

exception is for the purposes of "correcting a fundamentally unjust incarceration."   *House*

*v. Bell*,  547 U.S. 518, 536 (2006).   Generally, this standard requires a showing of actual

innocence.   *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("Accordingly, we think that in

an extraordinary case, where a constitutional violation has probably resulted in the

conviction of one who is actually innocent, a federal habeas court may grant the writ even

in the absence of a showing of cause for the procedural default.").   As a result, this Court

recommends that Vang's habeas petition fails procedurally.[3]

## IV. MERITS

Even if Vang's claims were not procedurally barred, they fail on their merits.  *See*

28 U.S.C. § 2254(b)(2).   Vang raises four issues in his habeas petition: unconstitutional

---

[3] Vang also filed a Motion for Default, Summary Judgment, and Declaratory Judgments based, in part, on the fact that the signature line of the state's response includes the name of the Minnesota Attorney General. (Docket No. 17.)  This Court finds no merit in his argument that this entitles him to any relief.  He further argues that the state should not have applied the *Knaffla* rule to his case.  The *Knaffla* rule states that "[o]nce a petitioner has taken a direct appeal, all claims raised in the direct appeal as well as 'all claims known but not raised' at the time of direct appeal are barred from consideration in any subsequent petitions for postconviction relief."  *Cooper v. State*, 745 N.W.2d 188, 190-91 (Minn. 2008) (quoting *State v. Knaffla,* 243 N.W.2d 737, 741 (Minn. 1976)).  Vang, however, never attempted state postconviction procedures so the *Knaffla* rule was never invoked.  As a result, this Court recommends dismissing the Motion.

search and seizure, illegal arrest; ineffective assistance of counsel; and denial of his right to a speedy trial.

Vang argues that the officers' actions when they stopped the car he was in and placed him in the back of the squad car on February 3, 2005, were unconstitutional. However, "[the police] need only have reasonable suspicion that criminal activity is afoot to stop someone." *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008). The emergency call that shots had been fired, officers' observation of a body in the parking lot, and the car leaving the parking lot the wrong way with its lights off and then accelerating through a stop sign, all supported a reasonable suspicion.

Vang argues his arrest was unconstitutional because he was arrested before officers determined there was a warrant for his arrest. "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights . . . ." *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986). "To evaluate whether probable cause existed for a warrantless arrest, the Court considers whether, based on the totality of the circumstances, the facts justified a 'reasonably cautious police officer's belief' that the subject has committed or was committing a criminal offense." *Galarnyk v. Fraser*, No. 08-3351, 2011 WL 3678433, at *5 (D. Minn. Aug. 22, 2011) (citing *Anderson v. Cass Cnty., Mo.,* 367 F.3d 741, 745 (8th Cir. 2004)). Here, along with the emergency call, the body in the parking lot, and the behavior of the car as it left the ramp, the officers also found ammunition in the vehicle. The totality of the circumstances, therefore, provided officers with probable cause to arrest Vang.

Vang argues ineffective assistance of counsel since his trial counsel failed to file an interlocutory appeal regarding the admissibility of informant incentive evidence. However, such an interlocutory appeal is not permitted under Minnesota law. *See* Minn. R. Crim. P. 28.02, subdiv. 2(2). For an ineffective assistance of counsel claim to prevail, counsel's performance must have fallen below an objective standard of reasonableness, meaning reasonableness under prevailing professional norms, **and** caused prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-68 (1984). Here, it was not unreasonable for Vang's counsel to refuse to file an appeal that was not permitted under the rules of the court. Further, had they filed the appeal, it would have been denied for violation of those very rules, thus Vang cannot demonstrate prejudice.

Finally, the trial transcript demonstrates that—contrary to Vang's current assertion that he only recently found out about his right to a speedy trial—he knowingly and voluntarily waived his right to a speedy trial. (*See* Hr'g Tr. at 2:20-3:5, June 25, 2007, Ex. 10, Docket No. 15 (Court: "I don't believe your client has made a speedy trial demand?" Counsel: "He has not, Your Honor. I've spoken with him briefly about that potential. I think he understands that. Meng, we did discuss briefly that the potential, because of a medical issue with the judge's family that this may have to be delayed until October 1 of this year; is that okay with you?" Vang: "It would be all right.").) Courts can enforce a defendant's knowing and intelligent waiver of his right to a speedy trial. *See Francis v. Henderson*, 425 U.S. 536, 551 n.2 (1976) (discussing waiver of constitutional rights). Vang's assertion in his brief that he thought he was helping the judge, not waiving a constitutional right, simply does not accord with his statement in his

motion that "no attorney said a word about it."  (Petition at 5, Docket No. 1.)  As a result, his waiver is enforceable.

## V.    CONCLUSION

Because Vang did not exhaust his state postconviction remedies, this Court is barred from hearing his habeas petition.  Furthermore, since postconviction relief is procedurally barred, and Vang's claims would fail on their merits, this Court recommends dismissal with prejudice.

## RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT**:

1.  Vang's Motion for Default, Summary Judgment, and Declaratory Judgments (Docket No. 17) be **DENIED**;

2.  Vang's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Docket No. 1) be **DENIED**;

3.  This action be **DISMISSED** with prejudice.

Dated:   September 30, 2011

s/  Arthur J. Boylan
Arthur J. Boylan
Chief United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before October 14, 2011.